N. PATRICK CROOKS, J.
¶ 1. This is a review of an unpublished opinion and order of the court of appeals[1] accepting post-conviction counsel's no-merit report and affirming the circuit court's conviction of the defendant, Cassius A. Foster (Foster).
*19 ¶ 2. Following a jury trial, Foster was convicted of operating a vehicle while under the influence of an intoxicant, sixth offense, in violation of Wis. Stat. § 346.63(l)(a).[2] The circuit court, Monroe County, the Honorable Todd L. Ziegler, presiding, entered a judgment of conviction on September 23, 2010. The circuit court withheld sentence and placed Foster on probation for three years, with one year of jail time as a condition of probation.
¶ 3. Thereafter, Foster filed a post-conviction motion seeking resentencing on the basis that his trial counsel was ineffective for failing to collaterally attack three prior drunk-driving convictions which enhanced his sentence. The circuit court ultimately denied the motion. The circuit court reasoned that Foster was not prejudiced by his trial counsel's failure to collaterally attack the three prior convictions because that challenge was unlikely to succeed.
¶ 4. Foster's post-conviction counsel then filed a no-merit report with the court of appeals. The court of appeals accepted the no-merit report and affirmed Foster's conviction.
¶ 5. Foster, proceeding pro se, filed a petition for review with this court. His petition focused solely on the issue of whether he possessed a meritorious claim for ineffective assistance of counsel.
¶ 6. While Foster's petition was pending before the court, the United States Supreme Court decided Missouri v. McNeely, 569 U.S. _, 133 S. Ct. 1552 (2013). McNeely abrogated our decision in State v. Bohling, 173 Wis. 2d 529, 547-48, 494 N.W.2d 399 (1993), to the extent that we held the natural dissipa *20 tion of alcohol in a person's bloodstream constitutes a per se exigency so as to justify a warrantless nonconsensual blood draw under certain circumstances. Because it appeared to us that the police relied on Bohling to effectuate the search and seizure of Foster's blood, we granted review.
¶ 7. Accordingly, this case presents two issues for our determination: (1) whether the warrantless non-consensual blood draw performed on Foster is constitutional in light of the United States Supreme Court's decision in McNeely, and if not, whether suppression of the evidence derived from Foster's blood is the appropriate remedy for that constitutional violation, or alternatively, whether the good faith exception to the exclusionary rule applies; and (2) whether the court of appeals properly accepted post-conviction counsel's no-merit report.
¶ 8. We hold that McNeely applies retroactively to the facts of this case and that the warrantless nonconsensual blood draw performed on Foster violated his right to be free from unreasonable searches and seizures. However, we decline to apply the exclusionary rule to suppress the evidence derived from Foster's blood. Because the police acted in objectively reasonable reliance upon the clear and settled precedent of Bohling in effectuating the search and seizure of Foster's blood, the good faith exception to the exclusionary rule precludes suppression of the evidence.
¶ 9. We further hold that the court of appeals properly accepted post-conviction counsel's no-merit report. The court of appeals reasonably exercised its discretion in finding no arguable merit to Foster's ineffective assistance of counsel claim on the basis that Foster failed to demonstrate the requisite prejudice to support that claim.
*21 ¶ 10. Therefore, we affirm the decision of the court of appeals and uphold Foster's conviction.
I
¶ 11. On March 6, 2009, at approximately 11:55 p.m., Officer Jarrod Furlano of the Tomah Police Department stopped Foster's vehicle for traveling fifty miles per hour in a thirty mile per hour speed zone. When approached by Officer Furlano, Foster struggled to lower his window and to produce his driver's license. Observing that Foster had glassy, bloodshot eyes and slurred speech, Officer Furlano asked Foster whether he had been consuming alcohol. Foster responded that he had consumed a couple beers.
¶ 12. As a result, Officer Furlano had Foster exit his vehicle for standardized field sobriety testing. He asked Foster to perform the "horizontal gaze nystagmus test," the "walk and turn test," and the "one leg stand test." According to Officer Furlano, Foster failed all three tests.
¶ 13. Officer Furlano then placed Foster under arrest and transported him to Tomah Memorial Hospital for a blood draw. Foster refused to consent to the draw. Acting without a warrant, Officer Furlano instructed a registered nurse to draw Foster's blood. The blood draw occurred at approximately 12:50 a.m. The results showed that Foster's blood-alcohol level was .112 at the time of the draw.
¶ 14. On March 20, 2009, Foster was charged with operating a vehicle while under the influence of an intoxicant (OWI), seventh offense.[3] The State later *22 amended the criminal complaint on May 28, 2009, to charge Foster with his sixth, not seventh, OWI.
¶ 15. On May 27, 2010, a jury convicted Foster of OWI. The State then introduced certified driving records from Wisconsin, Oklahoma, and Texas to establish that Foster had five prior drunk-driving convictions for purposes of sentencing under Wis. Stat. § 346.65(2)(am)5.[4]
¶ 16. On September 23, 2010, the circuit court entered a judgment of conviction reflecting Foster's sixth OWI offense. The circuit court withheld sentence and placed Foster on probation for three years, with one year of jail time as a condition of probation.
¶ 17. Foster then filed a post-conviction motion seeking resentencing on the basis that his trial counsel was ineffective for failing to collaterally attack his three prior drunk-driving convictions from Oklahoma. Underlying Foster's ineffective assistance claim was his contention that those convictions were obtained in *23 violation of his constitutional right to counsel; thus, the prior convictions should not have enhanced his sentence in this case.
¶ 18. In support of his motion, Foster submitted an affidavit alleging the following facts for each prior conviction: (1) he entered his guilty plea without the advice of counsel; (2) he did not affirmatively waive his right to counsel; and (3) he was not advised of his right to counsel. Foster further averred that he would have asked for a lawyer in each case because: (1) he did not know how serious the charge was; (2) he did not know how a conviction would affect him in the future; (3) he did not know that an attorney could assist him in contesting the charges against him; and (4) he did not know the difficulties and disadvantages of representing himself.
¶ 19. On June 15, 2011, the circuit court held a hearing pursuant to State v. Machner, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979),[5] wherein Foster's trial counsel testified on the matter of deficient performance. Trial counsel testified that she had two reasons for not collaterally attacking Foster's prior convictions. First, she believed that a collateral attack was a sentencing issue, not a trial issue, and that Foster could raise it at sentencing. Second, she withheld a collateral attack as a matter of trial strategy: Foster's objective was to negotiate a plea deal, and the State had a policy of withdrawing a pretrial offer in the face of an evidentiary motion.
¶ 20. At the Machner hearing, the circuit court also took testimony and received evidence on the *24 matter of prejudice. In order to evaluate whether Foster was prejudiced by his trial counsel's failure to collaterally attack his prior convictions, the circuit court proceeded under the burden-shifting collateral attack procedure that we set forth in State v. Ernst, 2005 WI 107, ¶ 37, 283 Wis. 2d 300, 699 N.W.2d 92. Pursuant to Ernst, the circuit court determined that Foster's affidavit made a prima facie showing that his waiver of counsel in the Oklahoma cases was not a knowing, intelligent, and voluntary one. The circuit court then shifted the burden to the State to prove otherwise by clear and convincing evidence.
¶ 21. The State sought to meet its burden by questioning Foster as to the averments in his affidavit.[6] The State also introduced two certified copies of the "Notice of Rights" form that Foster signed when he entered his guilty plea to each Oklahoma offense.[7] The forms provided, in relevant part:
I, (being of legal age) the defendant in this matter, for which if convicted I may be sentenced to jail, was advised in open court, of my right to be represented by *25 counsel of my choice, by the Municipal Public Defender if I so request and qualify as an indigent, or waive my right to counsel.
I FURTHER UNDERSTAND . .. THAT a record of any conviction in traffic cases will be sent to the Department of Public Safety of Oklahoma to become part of my permanent driving record.
¶ 22. Upon questioning, Foster admitted that he checked the box marked "I waive my right to counsel" on each form. The transcript from the Machner hearing indicates that the following exchange ensued:
THE STATE: When you just read to the judge that document informs you that you had a right to counsel and that you could have an attorney appointed to you if you were indigent, that is in direct contravention with what you testified earlier, correct?
THE DEFENDANT: Right.
THE STATE: And why did you testify earlier that you have never been advised that an attorney could be appointed for you?
THE DEFENDANT: That was my memory.
THE STATE: So you don't really remember what happened then in 1993 and 1994?
THE DEFENDANT: No.
¶ 23. Based on the State's evidence, Foster's post-conviction counsel conceded that the State had met its burden of proof that Foster knowingly, intelligently, and voluntarily waived his right to counsel in the Oklahoma cases. Post-conviction counsel then withdrew Foster's motion.
*26 ¶ 24. In any event, the circuit court denied Foster's motion. The circuit court reasoned that Foster was not prejudiced by his trial counsel's failure to collaterally attack the prior convictions because that challenge was unlikely to succeed. The circuit court explained that the State had offered sufficient evidence to prove that Foster knowingly, intelligently, and voluntarily waived his right to counsel and that such evidence rendered Foster's testimony incredible.
¶ 25. On October 3, 2011, Foster's post-conviction counsel filed a no-merit report with the court of appeals pursuant to Wis. Stat. § (Rule) 809.32 (2011-12). Foster filed a response to the no-merit report on October 12, 2011. He supplemented that response on November 7, 2011.
¶ 26. As we explain in greater detail below, the court of appeals accepted post-conviction counsel's no-merit report. Foster then filed a petition for review with this court. In the wake of the United States Supreme Court's decision in McNeely, we granted review.
II
¶ 27. We are asked to decide whether the warrantless nonconsensual blood draw performed on Foster is constitutional in light of McNeely. "The application of constitutional principles to a particular case is a question of constitutional fact." State v. Dearborn, 2010 WI 84, ¶ 13, 327 Wis. 2d 252, 786 N.W.2d 97. We accept the circuit court's findings of historical fact unless they are clearly erroneous. Id. We review the application of constitutional principles to those historical facts de novo. Id.
*27 ¶ 28. We are also asked to determine whether the court of appeals properly accepted post-conviction counsel's no-merit report. We do so under the erroneous exercise of discretion standard. See State v. Sutton, 2012 WI 23, ¶¶ 45-48, 339 Wis. 2d 27, 810 N.W.2d 210. "This court has been reluctant to interfere with the discretion of the court of appeals." Id., ¶ 45. "A reviewing court will sustain a discretionary decision if it finds that [] the lower court (1) examined the relevant facts, (2) applied a proper standard of law, and (3) used a demonstrative rational process in reaching a conclusion that a reasonable judge could reach." State v. Smythe, 225 Wis. 2d 456, 463, 592 N.W.2d 628 (1999).
¶ 29. Stated differently, in reviewing a court of appeals' decision to accept a no-merit report, we do not conduct our own independent review of the record as required by the United States Supreme Court in Anders v. California, 386 U.S. 738, 744-45 (1967) (setting forth the specific procedure that must be followed to protect a criminal defendant's right to counsel on appeal where appellate counsel believes that an appeal is frivolous). The Anders procedure applies only on direct appeal. Pennsylvania v. Finley, 481 U.S. 551, 554 (1987); Judicial Council Note, 2001, Wis. Stat. § (Rule) 809.32 (2011-12).
Ill
¶ 30. We begin by addressing whether the warrantless nonconsensual blood draw performed on Foster is constitutional in light of McNeely, and if not, *28 whether suppression of the evidence derived from Foster's blood is the appropriate remedy for that constitutional violation, or alternatively, whether the good faith exception to the exclusionary rule applies. We recently addressed a similar issue in State v. Kennedy, 2014 WI 132, 359 Wis. 2d 454, 856 N.W.2d 834, and we apply the same analysis employed in Kennedy to this case. Therefore, we begin with a discussion of Wisconsin law on searches and seizures prior to McNeely. We next consider McNeely and its effect on the instant matter, determining that the decision applies retroactively and renders unconstitutional the warrantless nonconsensual draw of Foster's blood. We then discuss the propriety of remedying that constitutional violation. We conclude that the good faith exception to the exclusionary rule precludes suppression of the blood draw evidence because the police acted in objectively reasonable reliance on the clear and settled precedent of Bohling in effectuating the search and seizure of Foster's blood.
A
¶ 31. "Both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect against unreasonable searches and seizures." State v. Eason, 2001 WI 98, ¶ 16, 245 Wis. 2d 206, 629 N.W.2d 625.[8] "We have *29 historically interpreted the Wisconsin Constitution's protections in this area identically to the protections under the Fourth Amendment as defined by the United States Supreme Court." Dearborn, 327 Wis. 2d 252, ¶ 14.
¶ 32. Consistent with the United States Supreme Court's interpretation of the Fourth Amendment, we have adhered to the basic principle that warrantless searches are per se unreasonable unless they fall within a well-recognized exception to the warrant requirement. State v. Mazur, 90 Wis. 2d 293, 301, 280 N.W.2d 194 (1979) (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971)). We continue to apply that principle to the kind of search performed in this case, "which involved a compelled physical intrusion beneath [Foster's] skin and into his veins to obtain a sample of his blood for use as evidence in a criminal investigation." McNeely, 133 S. Ct. at 1558.
¶ 33. Like the United States Supreme Court, we recognize an exception to the warrant requirement for a search performed incident to a lawful arrest. Leroux v. State, 58 Wis. 2d 671, 688, 207 N.W.2d 589 (1973) (citing Ker v. State of Cal., 374 U.S. 23, 41 (1963)). "A lawful arrest gives rise to heightened concerns that may justify a warrantless search, including the need to discover and preserve evidence." State v. Payano-Roman, 2006 WI 47, ¶ 31, 290 Wis. 2d 380, 714 *30 N.W.2d 548. "Pursuant to this rule, law enforcement officers have been permitted to seize samples of an arrestee's hair, breath, and urine solely on the basis of lawful arrest." Bohling, 173 Wis. 2d at 537.
¶ 34. However, "[b]lood constitutes a limited exception to the foregoing rule." Id. In Schmerber v. California, 384 U.S. 757, 770-71 (1966), the United States Supreme Court held that a warrantless nonconsensual blood draw performed incident to a lawful arrest is constitutional only where three conditions are met: (1) the police have a "clear indication"[9] that evidence of intoxication will be found in the blood; (2) exigent circumstances exist; and (3) the method chosen to draw the blood is a reasonable one that is performed in a reasonable manner.
¶ 35. Regarding the second prong of Schmerber's test, we note that the exigent circumstances doctrine is an exception to the warrant requirement that exists independent of the search incident to arrest exception. State v. Hughes, 2000 WI 24, ¶ 17, 233 Wis. 2d 280, 607 N.W.2d 621 (citing Payton v. New York, 445 U.S. 573, 575, 583-88 (1980)). The exigent circumstances doctrine requires an emergency situation which "overcome [s] the individual's right to be free from governmental interference," Id., because, as is relevant here, the delay in obtaining a warrant may result in the loss of evidence. Hughes, 233 Wis. 2d 280, ¶ 25.
¶ 36. The United States Supreme Court's mandate that the exigent circumstances doctrine be satisfied in the context of a blood draw incident to a lawful *31 arrest is a strong indication that the Fourth Amendment permits only "minor intrusions into an individual's body under stringently limited conditions . . . Schmerber, 384 U.S. at 772. The exigency sufficient to justify the minor intrusion into Schmerber's body concerned the destruction of evidence: "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." Id. at 770.
¶ 37. In the wake of Schmerber, jurisdictions split "on the question whether the natural dissipation of alcohol in the bloodstream establishes a per se exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations." McNeely, 133 S. Ct. at 1558. Thus, when we answered that question affirmatively in Bohling, 173 Wis. 2d at 539-40, we were not alone. See, e.g., Gregg v. State, 374 So. 2d 1301, 1303-04 (Miss. 1979) (reasoning that the metabolism of alcohol in the blood alone constitutes a sufficient exigency to justify a warrantless search); State v. Baker, 502 A.2d 489, 493 (Me. 1985) (holding same); State v. Woolery, 116 Idaho 368, 370, 775 P.2d 1210 (1989), overruled on other grounds by State v. Wulff, 337 P.3d 575 (Idaho 2014), abrogated by McNeely, 133 S. Ct. 1552 (holding same).
¶ 38. As a result of our decision in Bohling, a warrantless nonconsensual blood draw taken at the direction of a police officer was constitutional in the following circumstances:
(1) the blood draw [was] taken to obtain evidence of intoxication from a person lawfully arrested for a drunk-driving related violation or crime, (2) there [was] a clear indication that the blood draw [would] produce evidence of intoxication, (3) the method used *32 to take the blood sample [was] a reasonable one and performed in a reasonable manner, and (4) the arrestee present[ed] no reasonable objection to the blood draw.
Bohling, 173 Wis. 2d at 534 (footnote omitted).[10] Bohling remained the law in Wisconsin for twenty years.
B
¶ 39. In McNeely, the United States Supreme Court resolved the split among jurisdictions as to whether drunk-driving cases present a per se exigency sufficient to justify a warrantless nonconsensual search and seizure of a person's blood. The United States Supreme Court rejected a categorical rule in favor of a case-by-case, "totality of the circumstances" assessment of exigency. McNeely, 133 S. Ct. at 1561. Both the metabolization of alcohol in the bloodstream and the resulting loss of evidence are factors to consider in determining whether a warrant is required. Id. at 1568. However, "[i]n those drunk-driving investigations where police officers can reasonably obtain a *33 warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." Id. at 1561.
¶ 40. Insofar as McNeely rejects a categorical rule concerning exigency in drunk-driving cases, the United States Supreme Court's decision abrogates our holding in Bohling. Kennedy, 359 Wis. 2d 454, ¶ 32 ("In light of the Supreme Court's decision in McNeely, we recognize our holding in Bohling, that the rapid dissipation of alcohol alone constitutes an exigent circumstance sufficient for law enforcement officers to order a warrantless investigatory blood draw, is no longer an accurate interpretation of the Fourth Amendment's protection against unreasonable searches and seizures."). McNeely therefore creates a new constitutional rule of law for the state of Wisconsin.
¶ 41. The retroactivity rule provides that "newly declared constitutional rules must apply 'to all similar cases pending on direct review.'" Dearborn, 327 Wis. 2d 252, ¶ 31 (quotation omitted). Here, Foster's direct appeal was pending at the time McNeely was decided. Despite that fact, the State contends that Foster is not entitled to the benefit of retroactivity. The State's position is that the retroactivity rule should not apply to Foster since he did not have the foresight to raise a "McNeely claim" prior to McNeely being decided. In other words, according to the State, Foster forfeited his right to rely on McNeely.[11]
*34 ¶ 42. We disagree. We are unaware of an exception to the retroactivity rule for cases in which a criminal defendant fails to predict the newly declared constitutional rule that is subject to retroactive application. See Griffith v. Kentucky, 479 U.S. 314, 324-28 (1987) (discussing the exceptions to the retroactivity rule). The State has not pointed to any such exception. Therefore, we conclude that McNeely applies retroactively to this case.
¶ 43. The question becomes whether the warrantless nonconsensual draw of Foster's blood is constitutional under McNeely. There is no dispute that the police relied on Bohling to effectuate the search and seizure of Foster's blood. As we understand Foster's challenge to the admissibility of his blood draw results under McNeely, he questions whether exigent circumstances justified the police's action.[12]
¶ 44. Foster points out that the facts of this case are strikingly similar to those of McNeely.[13] As a result, *35 he asks this court to hold that the blood draw violated his constitutional right to be free from unreasonable searches and seizures, just as the United States Supreme Court did in McNeely.
¶ 45. We note that the United States Supreme Court did not decide whether the facts of McNeely constituted sufficient exigency to justify a warrantless nonconsensual blood draw under its totality of the circumstances test because the state's position relied entirely upon a per se rule of exigency in drunk-driving cases. McNeely, 133 S. Ct. at 1567. Thus, "the arguments and the record [did] not provide the Court with an adequate analytic framework for a detailed discussion of all the relevant factors that can be taken into account in determining the reasonableness of acting without a warrant." Id. at 1568.
¶ 46. Likewise, in this case, the State does not contend that exigent circumstances aside from the natural dissipation of alcohol in the bloodstream justified the police's search and seizure of Foster's blood. It is the State's burden to prove that exigent circumstances exist. State v. Robinson, 2010 WI 80, ¶ 24, 327 Wis. 2d 302, 786 N.W.2d 463. Under McNeely, the State has failed to meet its burden in this regard. Therefore, we conclude that the warrantless nonconsensual draw of Foster's blood was unconstitutional.
C
¶ 47. "When there has been an unlawful search, a common judicial remedy for the constitutional error *36 is exclusion." Dearborn, 327 Wis. 2d 252, ¶ 15. "The exclusionary rule bars evidence obtained in an illegal search and seizure from a criminal proceeding against the victim of the constitutional violation." State v. Ward, 2000 WI 3, ¶ 46, 231 Wis. 2d 723, 604 N.W.2d 517. "The exclusionary rule is a judicially created remedy, not a right, and its application is restricted to cases where its remedial objectives will best be served." Dearborn, 327 Wis. 2d 252, ¶ 35. It is well established that the primary purpose of the exclusionary rule is to deter unlawful police conduct. Illinois v. Krull, 480 U.S. 340, 347 (1987).
¶ 48. An exception to the exclusionary rule exists where "the officers conducting an illegal search 'acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment.'" Dearborn, 327 Wis. 2d 252, ¶ 33 (quoting United States v. Leon, 468 U.S. 897, 918 (1984)). We expressly adopted that "good faith exception" to the exclusionary rule in Eason, 245 Wis. 2d 206, ¶¶ 73-74, a case involving the police's objective, reasonable reliance on a facially valid search warrant. We later applied the good faith exception to a different factual scenario in Dearborn, holding "the good faith exception precludes application of the exclusionary rule where officers conduct a search in objectively reasonable reliance upon clear and settled Wisconsin precedent that is later deemed unconstitutional by the United States Supreme Court." Dearborn, 327 Wis. 2d 252, ¶ 51.
¶ 49. In Kennedy, 359 Wis. 2d 454, 478 ¶ 37, we relied on Dearborn to hold that the good faith exception to the exclusionary rule precluded suppression of the blood draw evidence which resulted from the assumed unlawful search and seizure of Kennedy's *37 blood. We explained that the police reasonably relied on the clear and settled law of Bohling to effectuate that search and seizure. Accordingly, we saw no reason to depart from Dearborn and our application of the good faith exception. Kennedy, 359 Wis. 2d 454, ¶ 37.
¶ 50. Here, Foster offers several reasons that the exclusionary rule is the appropriate remedy for the unlawful search and seizure of his blood. First, he argues that application of the exclusionary rule will deter future Fourth Amendment violations — not by the police, but by the courts. Foster's argument is atypical in this regard; deterrence arguments usually center on the actions of police. He contends that suppression in this case would deter state courts in the future from interpreting Fourth Amendment rights too narrowly in close cases. Specifically, he argued in his brief to this court that it would strengthen the rule of law "if, in such situations, state courts were encouraged to choose the more expansive reading of the Fourth Amendment's protection."
¶ 51. Second, Foster contends that suppression is warranted to preserve judicial integrity. He maintains that we failed to follow the controlling precedent of Schmerber when we decided Bohling, and as a result, our decision in Bohling was void ab initio.[14] According to Foster, it would serve the interests of judicial integrity to hold that there is no basis for good faith reliance on a void decision from this court, just as there is no basis for good faith reliance on an unauthorized, defective arrest warrant. See State v. Hess, 2010 WI 82, ¶ 60, 327 Wis. 2d 524, 785 N.W.2d 568 *38 (holding that the good faith exception to the exclusionary rule cannot save evidence seized based on a warrant the judge had no authority to issue).
¶ 52. Third, Foster argues for a bright line rule excepting bodily intrusion searches from the application of the good faith exception, on the grounds that this will maintain the sanctity of an individual's body.
¶ 53. The State contends that the good faith exception to the exclusionary rule applies. The State offers clear and established precedent to support the application of the good faith exception, namely, Dear-born. Thus, any departure from that established precedent would require us to create a new rule or exception.
¶ 54. The State also argues that application of the exclusionary rule would serve no remedial purpose. With respect to deterring police misconduct, the State maintains that suppression would have the opposite effect: it would encourage the police to ignore the law. As far as judicial integrity is concerned, the State contends Bohling could be reasonably relied upon because it represented a legitimate interpretation of Schmerber, which was subject to two interpretations until McNeely resolved the conflict.
¶ 55. Finally, the State argues that Bohling authorized the police to perform a reasonable search and seizure of Foster's blood. Therefore, there is no basis in existing law for excluding bodily intrusion searches from the application of the good faith exception, as Foster advocates.
¶ 56. We agree with the State and hold that the good faith exception to the exclusionary rule applies because the police conducted the search and seizure of Foster's blood in objectively reasonable reliance on the clear and settled precedent of Bohling. Foster's first *39 two arguments in favor of suppression rely heavily on the notion that we disregarded controlling precedent when we decided Bohling. However, as we explained in Bohling, Schmerber was susceptible to two reasonable interpretations. Bohling, 173 Wis. 2d at 539. Other courts agreed. See McNeely, 133 S. Ct. at 1558 n.2. Until the United States Supreme Court in McNeely spoke definitively on the issue of a per se exigency in drunk-driving cases, we were not precluded from exercising our own judgment on the constitutional matter. See Ward, 231 Wis. 2d 723, ¶ 38.
¶ 57. "Our decisions interpreting the United States Constitution are binding law in Wisconsin until this court or the United States Supreme Court declares a different opinion or rule." Id. As a result, we reject Foster's contention that our decision in Bohling was void ab initio,[15] and we decline to find that considerations of judicial integrity require exclusion of the blood draw evidence.
¶ 58. Finally, we are unconvinced that we should adopt a rule excluding bodily intrusion searches from the application of the good faith exception to the exclusionary rule. While intrusions into the human body implicate significant privacy concerns, they are permissible under reasonable circumstances. Schmerber, 384 U.S. at 770-72. Consistent with that principle, Bohling authorized the search and seizure of Foster's blood. Thus, we see no reason to depart from Dearborn and our application of the good faith exception.[16]
*40 IV
¶ 59. We now turn to Foster's contention that the court of appeals erred in accepting post-conviction counsel's no-merit report, as he possesses a meritorious claim for ineffective assistance of counsel. In finding that there was no arguable merit to Foster's ineffective assistance claim, the court of appeals reasoned that Foster was not prejudiced by his trial counsel's failure to collaterally attack his prior convictions because that challenge was unlikely to succeed.[17] Underlying the court of appeals' decision finding no prejudice was its conclusion that, at the Machner hearing, the State had affirmatively proved there was no basis for Foster's collateral attack.
¶ 60. We begin our analysis by explaining Wisconsin's no-merit procedure. We then discuss the procedure that a defendant must follow in order to succeed on a collateral attack in an enhanced sentence *41 proceeding on the ground that he or she was denied the constitutional right to counsel, as it informs our decision on whether the court of appeals reasonably determined that there was no arguable merit to Foster's ineffective assistance claim. Finally, we address the parties' arguments concerning the propriety of the court of appeals' decision to accept the no-merit report in light of these legal principles. We conclude that the court of appeals reasonably exercised its discretion in accepting the no-merit report.
A
¶ 61. In Anders, 386 U.S. at 744-45, the United States Supreme Court established a procedure that must be followed to preserve a criminal defendant's Sixth Amendment[18] right to counsel on appeal where appellate counsel believes that an appeal lacks any arguable merit. That procedure entails the following:
[I]f counsel finds his case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw. That request must, however, be accompanied by a brief referring to anything in the record that might arguably support the appeal. A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he chooses; the court — not counsel — then proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous. If it so finds it may grant counsel's request to withdraw and dismiss the appeal insofar as federal requirements are concerned, or proceed to a decision *42 on the merits, if state law so requires. On the other hand, if it finds any of the legal points arguable on their merits (and therefore not frivolous) it must, prior to decision, afford the indigent the assistance of counsel to argue the appeal.
Anders, 386 U.S. at 744.
¶ 62. Wisconsin Stat. § (Rule) 809.32 codifies the procedure oí Anders. The rule imposes a few additional requirements on counsel. Sutton, 339 Wis. 2d 27, ¶ 30. However, the essential requirement is as follows:
After submission of the no-merit report and the response, if the defendant provides one, the court of appeals follows the requirement of Anders: it "not only examines the no-merit report but also conducts its own scrutiny of the record to find out whether there are any potential appellate issues of arguable merit."
State v. Allen, 2010 WI 89, ¶ 21, 328 Wis. 2d 1, 786 N.W.2d 124 (quoting State v. Fortier, 2006 WI App 11, ¶ 21, 289 Wis. 2d 179, 709 N.W.2d 893). If the court of appeals determines that an appeal is frivolous, it "shall affirm the judgment of conviction or final adjudication and the denial of any postconviction or postdisposition motion and relieve the attorney of further responsibility in the case." Wis. Stat. § (Rule) 809.32(3) (2011-12).
¶ 63. Importantly, we "cannot assume that the court of appeals disregarded its duties under Anders when deciding a no-merit appeal." Allen, 328 Wis. 2d 1, ¶ 82. Therefore, we presume that the court of appeals considered all issues of arguable merit when conducting such a review even though it did not spell everything out in its opinion. Id., ¶ 72.
*43 B
¶ 64. To succeed on a claim for ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that it prejudiced the defense. State v. Carter, 2010 WI 40, ¶ 21, 324 Wis. 2d 640, 782 N.W.2d 695 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). As explained, the court of appeals focused exclusively on the prejudice prong of the Strickland test, determining that Foster was not prejudiced by his trial counsel's failure to collaterally attack his prior convictions because that attack was unlikely to succeed.[19] Accordingly, Foster's challenge to the court of appeals' decision accepting the no-merit report hinges on the likely success of a collateral attack on his prior convictions.
¶ 65. In State v. Hahn, 2000 WI 118, ¶ 28, 238 Wis. 2d 889, 618 N.W.2d 528, we held that a criminal defendant may collaterally attack a prior conviction in an enhanced sentence proceeding on the basis that he or she was denied the constitutional right to counsel. We later set forth a procedure that a defendant must follow in order to succeed on that type of collateral attack. Ernst, 283 Wis. 2d 300, ¶ 37. We find it helpful to briefly discuss the Ernst procedure.
¶ 66. For there to be a valid collateral attack, a criminal defendant must "make a prima facie showing *44 that his or her constitutional right to counsel in a prior proceeding was violated." Id., ¶ 25. General allegations will not suffice; "we require the defendant to point to facts that demonstrate that he or she 'did not know or understand the information which should have been provided' in the previous proceeding and, thus, did not knowingly, intelligently, and voluntarily waive his or her right to counsel." Id. (quoting State v. Hampton, 2004 WI 107, ¶ 46, 274 Wis. 2d 379, 683 N.W.2d 14). "Any claim of a violation on a collateral attack that does not detail such facts will fail." Ernst, 283 Wis. 2d 300, ¶ 25.
¶ 67. If the defendant makes out a prima facie case, "the burden shifts to the State to prove by clear and convincing evidence that the defendant's waiver of counsel was knowingly, intelligently, and voluntarily entered." Id., ¶ 27. In explaining the State's burden of proof, we cited favorably to our decision in State v. Bangert, 131 Wis. 2d 246, 275, 389 N.W.2d 12 (1986), for the proposition that "the state will be required to show that the defendant in fact possessed the constitutionally required understanding and knowledge which the defendant alleges the inadequate plea colloquy failed to afford him." (emphasis added). If the State fails to meet its burden, the defendant's collateral attack will prevail. Id.
C
¶ 68. We now turn to the parties' arguments concerning the propriety of the court of appeals' decision to accept the no-merit report in light of the foregoing legal principles.
*45 ¶ 69. Foster asserts that there is arguable merit to his ineffective assistance of counsel claim[20] and thus the court of appeals erred in accepting the no-merit report. Specifically, he contends that he was prejudiced by his trial counsel's failure to collaterally attack his prior convictions because that challenge was likely to succeed. Given the evidence adduced at the Machner hearing, Foster believes that he would have prevailed on a collateral attack because the State could not prove that, at the time he allegedly waived counsel, he was aware of the general range of penalties that he faced.[21] The United States Supreme Court has held that a defendant must possess such knowledge in order to validly waive his or her right to counsel. Iowa v. Tovar, 541 U.S. 77, 81 (2004).
¶ 70. According to the State, the court of appeals properly accepted the no-merit report on the basis that Foster failed to demonstrate prejudice for purposes of *46 his claim for ineffective assistance. The State argues that Foster is unlikely to succeed on a collateral attack because he has not made a prima facie showing of an invalid waiver of counsel in the prior proceedings, as required by Ernst. Relying on Posnanski v. City of West Allis, 61 Wis. 2d 461, 466, 213 N.W.2d 51 (1973), the State asserts that the incredible nature of Foster's testimony at the Machner hearing "erased" Foster's allegations made in support of his prima facie case. The result, per the State's reasoning, is that it never had the burden to prove that Foster knowingly, intelligently, and voluntarily waived his right to counsel.
¶ 71. Alternatively, the State asks that we treat Foster's inability to recall the events of the prior drunk-driving proceedings at the Machner hearing as a refusal to testify. Under Ernst, Foster's refusal to testify would allow a court to "draw the reasonable inference that the State has satisfied its burden, and that the waiver of counsel was a knowing, intelligent, and voluntary one." Ernst, 283 Wis. 2d 300, ¶ 35.
¶ 72. We agree with the State that the court of appeals properly accepted the no-merit report on the basis that Foster failed to demonstrate prejudice for purposes of his ineffective assistance claim. In reaching that result, however, we do not adopt the State's reasoning, which would require us to perform an independent review of the record.[22] Because it is apparent that the court of appeals examined all of the *47 relevant facts and exercised reasonable and lawful discretion in determining that there was no arguable merit to Foster's ineffective assistance claim, we affirm the court of appeals.
f 73. The court of appeals clearly examined the relevant facts necessary to make its determination that there was no arguable merit to Foster's ineffective assistance claim. In evaluating whether Foster was prejudiced by his trial counsel's failure to collaterally attack his prior convictions, the court of appeals appropriately reviewed the circuit court's findings of fact with respect to the likely success of that challenge. The court of appeals specifically referenced the circuit court's findings of fact in its decision and order, including those related to the incredible nature of Foster's testimony and the validity of the waiver forms that Foster admitted to signing at the prior proceedings.
¶ 74. The court of appeals then correctly deferred to the aforementioned factual findings in reaching its decision on the no-merit issue. See Carter, 324 Wis. 2d 640, ¶ 19 (explaining that an appellate court will uphold a circuit court's findings of fact with respect to ineffective assistance unless they are clearly erroneous). Based on those factual findings, the court of appeals reasonably concluded that Foster had failed to meet his burden of proving prejudice for purposes of his claim for ineffective assistance. Stated differently, the evidence supports the court of appeals' reasonable determination that Foster had not affirmatively established that his trial counsel's allegedly deficient performance adversely affected his sentence.
¶ 75. Although Foster contends that the court of appeals did not reach a reasonable conclusion in ac *48 cepting the no-merit report because it failed to recognize a deficiency in the record, namely, the absence of evidence indicating that he was aware of the general range of penalties he faced at the time he waived his right to counsel in the prior proceedings, we disagree.
¶ 76. We explained in Ernst that a defendant must allege specific facts to demonstrate that he or she did not know or understand the information that should have been provided in the previous proceeding. Ernst, 283 Wis. 2d 300, ¶ 25. Only then is the State required to show that" 'the defendant in fact possessed the constitutionally required understanding and knowledge which the defendant alleges the inadequate plea colloquy failed to afford him.'" Id., ¶ 31 (quoting Bangert, 131 Wis. 2d at 275) (emphasis added).
¶ 77. In this case, Foster raised an assortment of issues in his affidavit in support of his post-conviction motion for resentencing. However, he did not allege that he was unaware of the general range of penalties that he faced at the time he waived his right to counsel in the prior proceedings. Accordingly, Foster failed to make a prima facie showing on that issue. That means the burden never shifted to the State to prove otherwise by clear and convincing evidence. To hold that the State had the burden to affirmatively prove that Foster possessed such knowledge where Foster did not allege a deficiency in that regard is to ignore the legal principle that we presume a proper waiver of counsel in situations involving collateral attacks. Ernst, 283 Wis. 2d 300, ¶ 31 n.9.
¶ 78. Because the court of appeals carefully examined the relevant facts and exercised reasonable and lawful discretion in determining that there was no *49 arguable merit to Foster's ineffective assistance claim, we affirm its decision to accept post-conviction counsel's no-merit report.
V
¶ 79. We hold that McNeely applies retroactively to the facts of this case and that the warrantless nonconsensual blood draw performed on Foster violated his right to be free from unreasonable searches and seizures. However, we decline to apply the exclusionary rule to suppress the evidence derived from Foster's blood. Because the police acted in objectively reasonable reliance upon the clear and settled precedent of Bohling in effectuating the search and seizure of Foster's blood, the good faith exception to the exclusionary rule precludes suppression of the blood draw evidence.
¶ 80. We further hold that the court of appeals properly accepted post-conviction counsel's no-merit report. The court of appeals reasonably exercised its discretion in finding no arguable merit to Foster's ineffective assistance of counsel claim on the basis that Foster failed to demonstrate the requisite prejudice to support that claim.
¶ 81. Therefore, we affirm the decision of the court of appeals and uphold Foster's conviction.
By the Court. — The decision of the court of appeals is affirmed.

 State v. Foster, No. 2011AP1673-CRNM, unpublished order (Wis. Ct. App. Dec. 10, 2012).

 All references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

 Foster was also charged with operating a motor vehicle with a prohibited alcohol concentration in violation of Wis. *22 Stat. § 346.63(l)(b). The circuit court dismissed that charge at sentencing pursuant to Wis. Stat. § 346.63(l)(c).

 Wis. Stat. § 346.65(2)(am)5 provides:
Any person violating s. 346.63(1):
(5) Except as provided in pars, (f) and (g), is guilty of a class H felony and shall be fined not less than $600 and imprisoned for not less than 6 months if the number of convictions under ss. 940.09(1) and 940.25 in the person's lifetime, plus the total number of suspensions, revocations and other convictions counted under s. 343.307(1), equals 5 or 6, except that suspensions, revocations or convictions arising out of the same incident or occurrence shall be counted as one.
Of Foster's five prior drunk-driving convictions, three were from Oklahoma and two were from Texas. The Oklahoma convictions took place in 1991, 1993, and 1994. The Texas convictions occurred in 1997 and 1998.

 In Machner, the court of appeals held that "it is a prerequisite to a claim of ineffective representation on appeal to preserve the testimony of trial counsel." State v. Machner, 92 Wis. 2d 797, 804, 285 N.W2d 905 (Ct. App. 1979).

 We note that there is no transcript of the proceedings that took place in the Oklahoma cases.

 Foster's post-conviction motion alleged that his trial counsel was ineffective for failing to collaterally attack three prior convictions from Oklahoma. However, he later conceded that one of those convictions, an implied consent conviction from 1991, was not subject to collateral attack because it was a civil violation that did not implicate his constitutional right to counsel. See State v. Hahn, 2000 WI 118, ¶ 28, 238 Wis. 2d 889, 618 N.W.2d 528 (holding that a defendant may not collaterally attack a prior conviction in an enhanced sentence proceeding predicated on the prior conviction except where the challenge is based on a denial of his or her right to counsel). Therefore, we focus on the Oklahoma convictions from 1993 and 1994, as did the circuit court and the court of appeals.

 The Fourth Amendment to the United States Constitution provides:
[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
*29 Article I, Section 11 of the Wisconsin Constitution states:
[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

 "Clear indication" is the legal equivalent of "reasonable suspicion." State v. Seibel, 163 Wis. 2d 164, 173, 471 N.W.2d 226 (1991).

 We note that our four factor test in Bohling sets forth the proper procedure for conducting a warrantless nonconsensual blood draw in the context of a search incident to a lawful arrest, consistent with Schmerber v. California, 384 U.S. 757 (1966). In the absence of a lawful arrest, a "warrantless, nonconsensual blood draw of a suspected drunken driver complies with the Fourth Amendment if: (1) there was probable cause to believe the blood would furnish evidence of a crime; (2) the blood was drawn under exigent circumstances; (3) the blood was drawn in a reasonable manner; and (4) the suspect did not reasonably object to the blood draw." State v. Tullberg, 2014 WI 134, ¶ 31, 359 Wis. 2d 421, 857 N.W.2d 120 (citing State v. Erickson, 2003 WI App 43, ¶ 9, 260 Wis. 2d 279, 659 N.W.2d 407; Schmerber, 384 U.S. at 769-71).

 Forfeiture involves a party's failure to timely assert a right. State v. Ndina, 2009 WI 21, ¶ 29, 315 Wis. 2d 653, 761 N.W.2d 612.

 Aside from exigency, Foster does not contest that the four requirements we set forth in Bohling for conducting a lawful search and seizure of a person's blood incident to arrest were satisfied. In other words, Foster does not dispute that: (1) his blood was taken to obtain evidence of intoxication incident to a lawful arrest for a drunk-driving related violation or crime; (2) there was a clear indication that his blood draw would produce evidence of intoxication; (3) the method used to perform his blood draw was a reasonable one that was performed in a reasonable manner; and (4) he presented no reasonable objection to the blood draw. As we explained in State v. Kennedy, 2014 WI 132, ¶ 17, 359 Wis. 2d 454, 856 N.W.2d 834, McNeely did not abrogate these requirements.

 Just like the defendant in McNeely, Foster was pulled over for speeding; he showed signs of intoxication; he acknowledged drinking; he failed field sobriety tests; he was arrested; and he refused a blood draw. See Missouri v. McNeely, 569 U.S. __133 S. Ct. 1552, 1556-57 (2013). Moreover, in this case, as *35 in McNeely, the police ordered a warrantless draw of Foster's blood within one hour of the initial traffic stop. Id.

 Ab initio is defined as "[f]rom the beginning." Black's Law Dictionary 4 (7th ed. 1999).

 Foster's reliance on State v. Hess, 2010 WI 82, 327 Wis. 2d 524, 785 N.W.2d 568 is therefore misplaced.

 Other courts have applied the good faith exception to the exclusionary rule to preclude suppression in light of McNeely's retroactive effect. See, e.g., State v. Reese, 2014 WI App 27, *40 ¶ 22, 353 Wis. 2d 266, 844 N.W.2d 396 (holding that the warrantless nonconsensual blood draw evidence should not be excluded in light of McNeely because the police followed clear and settled law at the time of the search and seizure); United States v. Lechliter, 3 F. Supp. 3d 400, 408-09 (D. Md. 2014) (holding same); State v. Edwards, 2014 S.D. 63, ¶ 19, 853 N.W.2d 246 (holding same).

 Foster's post-conviction motion for resentencing alleged that his trial counsel was ineffective. Nevertheless, his responses to the no-merit report claimed that both trial counsel and post-conviction counsel were ineffective. In its opinion and order, the court of appeals focused solely on the issue of whether trial counsel's allegedly deficient performance prejudiced Foster, determining that it did not. However, we presume that the court of appeals also considered the issue of post-conviction counsel's alleged ineffectiveness and reached the same result. See State v. Allen, 2010 WI 89, ¶¶ 72, 82, 328 Wis. 2d 1, 786 N.W.2d 124. Since both claims depend on a finding of prejudice, we review them as one.

 The Sixth Amendment to the United States Constitution provides in part:
In all criminal prosecutions, the accused shall enjoy the right. .. to have the Assistance of Counsel for his defence.

 To prove prejudice, a defendant must demonstrate that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" State v. Carter, 2010 WI 40, ¶ 37, 324 Wis. 2d 640, 782 N.W.2d 695 (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)).

 Like the circuit court and the court of appeals, Foster focuses exclusively on the prejudice prong of his claim for ineffective assistance. Since we are not required to perform an independent review of the record under Anders, our discussion is limited to whether the court of appeals reasonably determined that there was no arguable merit to Foster's ineffective assistance claim on the basis that he was not prejudiced by his trial counsel's failure to collaterally attack his prior convictions.

 Foster first raised this argument in his briefs before this court. He sometimes conflates this issue with a separate one, namely, whether he was aware of the seriousness of the charges in the prior proceedings. See State v. Klessig, 211 Wis. 2d 194, 206, 564 N.W.2d 716 (1997) (identifying the "seriousness of charges" and the "general range of penalties" as separate issues). However, a fair reading of Foster's argument reveals that he is challenging the court of appeals' decision solely on the basis that there is no evidence to suggest that he was aware of the general range of penalties that he faced at the time he waived his right to counsel in the prior proceedings.

 The court of appeals did not employ the State's reasoning in reaching its conclusion that Foster had not demonstrated prejudice for purposes of ineffective assistance. In finding no prejudice, the court of appeals reasoned that Foster was unlikely to succeed on a collateral attack of his prior convictions because the State had affirmatively proved, per Ernst, that there was no basis for making such a challenge. As *47 explained, our review is limited to whether that decision constituted an erroneous exercise of discretion.